**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ROBERT LAWSHE, MICHELE LAWSHE as individuals and as officers Of R & M AMUSEMENTS AND SKYLANDS PETROLEUM, EVAN LAWSHE and CHRIS LAWSHE, infant minors by their parents, | : : : : : : : : | **OPINION** Civ. No. 03-3506 (WHW) |
| Plaintiffs, | : : | |
| v. | : : | |
| JOHN SQUERI individually and SPARTAN OIL, JOHN DOE, JOHN DOE II and JOHN DOE III, | : : : : | |
| Defendants. | | |

**Walls, Senior District Judge**

        Plaintiffs, Robert Lawshe, Michele Lawshe, Evan Lawshe and Chris Lawshe, move for summary judgment on the claims in their Complaint. Defendants, John Squeri ("Squeri") and Spartan Oil Complany ("Spartan"), move to enforce a settlement agreement they contend was reached with Plaintiffs. Alternatively, Defendants move for summary judgment asking the Court to dismiss with prejudice the claims in the Complaint. The Court heard oral argument on January 6, 2010. The Court denies Defendants' motion to enforce the settlement agreement. The Court grants Defendants' motion for summary judgment and dismisses with prejudice the claims in the Complaint. The Court denies Plaintiffs' motion for summary judgment.

NOT FOR PUBLICATION

## BACKGROUND

I.      **Plaintiffs' Allegations**

Plaintiffs allege the following facts:  in 2001, Skylands Petroleum, Inc.

("Skylands") entered into a franchise agreement with Defendant Spartan to lease and operate two

Texaco petroleum stations.  (Compl. ¶ 15.)  Plaintiff Robert Lawshe ("Lawshe"), the President of

Skylands, observed that Spartan was providing unbranded gasoline to the stations in violation of

a contract with Texaco specifying that only Texaco gasoline be used.  (Compl. ¶ 16.)  Lawshe

complained about this to Spartan, but Spartan ignored his complaints.  (Compl. ¶¶ 17, 18.)

Lawshe then contacted Texaco directly to inform it about Spartan's contractual breach.

(Compl. ¶ 19.)  In response, on or about February 1, 2002, Defendant Squeri appeared at the two

stations with a locksmith, changed the locks, and told Lawshe that he was not allowed to return

to the premises.  (Compl. ¶ 22.)  Lawshe asked Squeri why he did this, and Squeri replied first by

demanding money, and then by telling Lawshe that he was "going to make him pay for what he

did."  (Compl. ¶ 23.)

Plaintiffs say that, "[a]fter Mr. Lawshe was locked out of both premises, he

suffered a breakdown.  To a degree of medical certainty, from February 2002 to June 2002,

Mr. Lawshe was not mentally competent as he suffered said break from reality as a result of

Defendant Squeri taking away all his money and assets."  (Compl. ¶ 25.)  Plaintiffs state that Mr.

Lawshe had all of his assets tied up in the two petroleum stations.  (Compl. ¶ 26.)

Plaintiffs claim that they had two buyers lined up for their petroleum stations, but

that Squeri stopped the sales from going through.  Plaintiffs allege that an "agent of Spartan Oil

-2-

**NOT FOR PUBLICATION**

stated that this was proceeding in this manner because John Squeri had issues with Plaintiff, Robert Lawshe in complaining about the enterprise corruption that Spartan was guilty of." (Compl. ¶ 32.)  Plaintiffs allege that this "bad faith refusal caused significant harm to the plaintiffs, their finances, and their medical conditions."  (Compl. ¶ 33.)  Plaintiffs further allege that "Spartan leased the premises to one (1) of Mr. Lawshe's buyers, within a week of the wrongful seizure and subsequent termination in violation of the 30 day requirement of the PMPA."  (Compl. ¶ 43.)

In 2002, a criminal proceeding in Morris County was initiated against Lawshe. Spartan filed a Victim Impact Statement with the Morris County Prosecutor's Office stating that Spartan lost $88,000 due to Lawshe's fraudulent activities involving credit card receipts at the petroleum stations.  On March 16, 2004, Lawshe was accepted into Morris County's Pretrial Intervention Program.  He was ordered to pay restitution to Spartan and to serve 24 months supervision in exchange for dismissal of the criminal charges against him.  (Ex. B to McCreedy Cert. in Opp.)

Plaintiffs filed their Complaint on July 23, 2003, and stated the following claims: (1) Violation of the Petroleum Marketing Practices Act ("PMPA") for locking Plaintiffs out of their petroleum stations without advance notice (First Claim); (2) "Bad faith refusal" for preventing Plaintiffs from selling their petroleum stations to their own bona fide buyers, resulting instead in their sale to Defendants' buyers (Second Claim); (3) Slander, libel and defamatation for filing a criminal complaint against Lawshe in bad faith accusing him of criminal activities with credit card receipts (Third Claim); (4) Violation of the PMPA for leasing the petroleum

NOT FOR PUBLICATION

stations to one of Mr. Lawshe's buyers "within a week of the wrongful seizure and subsequent

termination in violation of the 30 day requirement of the PMPA" (Fourth Claim);[1] (5) "Extreme

and outrageous intentional conduct in violation of [s]tatutory and case law," causing "severe

emotional harm" to Evan Lawshe, Chris Lawshe, Michele Lawshe, and Robert Lawshe (Fifth

through Eighth Claims).

## II.    Settlement Negotiations

In the winter and spring of 2009, the parties engaged in settlement negotiations.

On March 12, 2009, Jim McCreedy (Counsel for Defendants) sent Alan Rodetsky (Counsel for

Plaintiffs) a proposed settlement agreement for his review.  (Dkt. No. 59-5.)  Mr. Rodetsky

replied by asking Mr. McCreedy to add additional language stating that, if the parties settled,

Defendants would "hereby agree to withdraw with prejudice the claims set forth in the criminal

action [pending against Mr. Lawshe]."  (Dkt. No. 59-6.)  Mr. McCreedy replied that he was

"uncomfortable making decisions for the Prosecutor's office or mixing the civil and criminal

matters" and suggested alternative language.  (Dkt. No. 59-7.)  On March 20, 2009, Mr.

McCreedy wrote to the Magistrate Judge, telling her that "the parties have worked out a

settlement of this civil action" but that "the sticking point with regard to the enclosed relates to

the request of Plaintiff Lawshe's counsel to add a paragraph, not currently in the draft agreement,

relating to the pending Morris Country criminal matter."  (Dkt. No. 59-8.)  Defendants concluded

that because this "is the sole issue remaining and creating an impasse to settlement at this point,

---

[1]    Plaintiffs' Complaint lists two distinct "Fourth Claims."  As a result, although the
Complaint itself counts up to seven claims, there are actually eight claims.  For clarity, this
Opinion will refer to Plaintiffs' claims as if they were properly numbered.

**NOT FOR PUBLICATION**

we respectfully submit that a conference with Your Honor may resolve the outstanding issue and bring this matter to final settlement." (Id.) On April 20, 2009, Mr. Rodetsky wrote to this Court, stating that the parties had never reached a settlement agreement. (Dkt. No. 51.) Mr. Rodestky also stated that, unbeknownst to him, Plaintiff Michele Lawshe had been in a psychiatric facility, and she had not authorized Mr. Rodetsky to settle the case on her behalf. (Id.)

In 2009, the Prosecutor's Office dropped the criminal charges against Mr. Lawshe. Defendants state that the Prosecutor's Office may have "believed that the parties had worked out a settlement of the civil matter, . . . and thus, restitution was no longer warratned." (Defendants Motion to Enforce Settlement Agreement and for Summary Judgment ("Def. Br."), at 4 n.1.)

Plaintiffs now move for summary judgment on the counts in their Complaint. Defendants move for summary judgment seeking dismissal of the Complaint.

## STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. See id. at 248. The moving party must show that if the evidentiary material

NOT FOR PUBLICATION

of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  To survive a motion for summary judgment, a nonmovant must present more than a mere scintilla of evidence in his favor.  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings.  Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).  At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  See Anderson, 477 U.S. at 249.  In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party.  Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002).

**DISCUSSION**

I.      **Formation of Settlement Agreement**

        A.      **Legal Standard**

        Under New Jersey law, "parties may orally, by informal memorandum, or by both agree upon all the essential terms of a contract and effectively bind themselves thereon, if that is their intention, even though they contemplate the execution later of a formal document to memorialize their understanding."  Comerata v. Chaumont, Inc., 52 N.J. Super. 299, 305 (App.

**NOT FOR PUBLICATION**

Div. 1958).  To be judicially enforceable, the non-executed settlement agreement must have "the

basic contract formation elements of offer and acceptance of sufficiently definite essential terms,

or in other words, mutual assent to the same terms (a 'meeting of the minds')."  LNT Merch. Co.

v. Dyson, Inc., No. 08-cv-2883, 2009 U.S. Dist. LEXIS 62308 (D.N.J. July 21, 2009) (citing

Pascarella v. Bruck, 190 N.J. Super. 118, 124-25 (App. Div. 1983)).

          The burden is on the moving party to show that the parties entered into a

settlement agreement.  Fritze, LLC v. Kominsky, No. A-2929-08T1, 2009 N.J. Super. Unpub.

LEXIS 2598,  at *11 (App. Div. Oct. 21, 2009).  See also Amatuzzo v. Kozmiuk, 305 N.J. Super.

469, 474-75 (App. Div. 1997) ("On a disputed motion to enforce a settlement, as on a motion for

summary judgment, a hearing is to be held to establish the facts unless the available competent

evidence, considered in a light most favorable to the non-moving party, is insufficient to permit

the judge, as a rational factfinder, to resolve the disputed factual issues in favor of the non-

moving party.").

          An attorney's negotiations to settle a case are not binding on his client unless the

client has "expressly authorized the settlement or the client's voluntary act has placed the

attorney in a situation where a person of ordinary prudence would be justified in presuming that

the attorney had authority to enter into a settlement, not just negotiations, on behalf of the client."

Amatuzzo, 305 N.J. Super. at 475.  New Jersey law provides that "where the client[,] by words or

conduct communicated to the adverse attorney, engenders a reasonable belief that the attorney

possesses authority to conclude a settlement, the settlement may be enforced.  However, the

-7-

NOT FOR PUBLICATION

attorney's words or acts alone are insufficient to cloak the attorney with apparent attorney."

Amatuzzo, 305 N.J. Super. at 475-76.

> **B.     Analysis**

Defendants argue that "the parties worked out a settlement, with significant detail

right down to how the Plaintiffs were to pay Defendant Spartan Oil the $45,000, with immediate

payment by certified bank check and the subsequent payments in monthly installments. . . . A

draft of the settlement agreement followed the discussions and both sides were in agreement with

the language; with the exception that Plaintiff Robert Lawshe's counsel added a new paragraph

relating to the then pending Morris County criminal matter. . . . The foregoing was the sole issue

that created an impasse to settlement.  The emails demonstrate that the essential issues were set

forth and no other issues were ever raised because the parties were in agreement.  Now that the

criminal matter has since been dropped by the Prosecutor's Office . . . there is no impasse.

Nonetheless, Plaintiffs now reneged on their acceptance of the agreement."  (Def. Br. at 14-15.)

Defendants argue that the relevant case law supports their position that there was a "meeting of

the minds on the essential terms and thus an agreement was reached."  (Def. Br. at 15.)

Plaintiffs counter that there was never an agreement on essential issues.

Mr. Rodetsky states:  "After an impasse regarding negotiations, a trial date, the failure to produce

records . . . I specifically rejected the discussions, all of which included 'this is not binding' on

the parties.  After that, I talked with Mr. McCreedy, who insisted on his terms, I rejected same as

not in accord with the parameters set by the clients."  (Pl. Opp'n at 4.)  Mr. Rodetsky contends

that he specifically told Mr. McCreedy that he would "not agree to anything" until he received

**NOT FOR PUBLICATION**

certain discovery that he requested.  (Pl. Opp'n at 7.)  Mr. Rodetsky concludes that since "there were disputed, and outstanding issues, there was no meeting of the minds, there was no contract." (Pl. Opp'n at 7.)  In addition, Mr. Rodetsky states that his client had not authorized him to settle the case, and his negotiations with Mr. McCreedy could not have been binding on his client.  (Pl. Opp'n at 7.)

The Court finds that Defendants have not met their burden of showing that the parties entered into a binding settlement agreement.  They have not shown that Mr. Rodetsky "intended to be bound" by the proposed draft agreement, "or rather, whether it was [his] expectation that no binding contract would exist until a written settlement agreement had been reviewed, agreed to, and executed by the parties."  LNT Merch., 2009 U.S. Dist. LEXIS 62308, at *9-10.  In addition, there was at least one outstanding issue that Mr. Rodetsky communicated to Mr. McCreedy would need to be resolved before any settlement was finalized (resolution of the criminal charges against Lawshe).  Defendants have failed to show that there was ever a "meeting of the minds" on all essential terms.

Moreover, Mr. Rodetsky claims that he did not have authority to settle the action without his clients' consent, and he states that he told this to Mr. McCreedy.  (Pl. Opp'n at 8.) Whether this was communicated to Mr. McCreedy, Mr. Rodetsky's own conduct could not cloak him with apparent authority to settle the dispute on behalf of his clients.  Defendants have not shown that Mr. Rodetsky's clients "by words or conduct" communicated to Mr. McCreedy that Mr. Rodetsky had authority to settle the action on their behalf.

The Court denies Defendants' motion to enforce the settlement agreement.

-9-

NOT FOR PUBLICATION

**II.    Statute of Limitations as to PMPA Claims**

**A.    Legal Standard**

The PMPA provides that a franchisee may sue a franchisor for alleged violations of the Act if the lawsuit is "commenced within 1 year after the later of – (1) the date of termination of the franchise or nonrenewal of the franchise relationship; or (2) the date the franchiser fails to comply with the requirements of section 102, 103, or 107."  15 U.S.C. § 2805(a).  See also Kehm Oil Co. v. Texaco, Inc., 537 F.3d 290, 294 (3d Cir. 2008) ("Congress also included a statute of limitations for PMPA actions.  The PMPA provides that "no . . . action may be maintained [under the PMPA] unless commenced within 1 year . . . of . . . the date of termination of the franchise or nonrenewal of the franchise relationship.") (quoting 15 U.S.C. § 2805(a)).

**B.    Analysis**

Defendants contend that all of Plaintiffs' claims are "subsumed within" the PMPA and time-barred by its one year statute of limitations.  (Def. Br. at 15.)  Defendants argue that the "Complaint suggests that the operative facts occurred on or about February 1, 2002 when Plaintiff claims to have been locked out of two service stations by the Defendants and all of the allegations stems from this alleged event, including the multibillion dollar damage claim. . . . Even if considered filed [on July 23, 2003] despite being sent to the Court by out-of-state counsel, who was neither admitted to the New Jersey bar nor admitted pro hac vice, at the time, the Complaint was filed far outside the one-year statute of limitations for the claims set forth in the Complaint."  (Def. Br. at 16.)

-10-

NOT FOR PUBLICATION

Plaintiffs advance several reasons why the statute of limitations should not bar their claims.  First, they contend that Mr. Lawshe was rendered mentally incompetent as a result of Defendants' alleged tortious conduct and that the statute of limitations cannot run during that period.  See Compl. ¶ 45 ("This complaint has been put together quickly as a result of the time constraints as the Statute of Limitations would have run if not for the mental incompetence that was established by Mr. Lawshe's doctor that arose out of this situation.  Thus, since the final breach occurred, as per Spartan Oil in March 2002, the additional months of incompetence as per the Physician's Affidavit, permit this matter to be brought in the proper forum to hear a PMPA case – the United States courthouse.").  See also Pl. Opp'n to Def. Mot. to Vacate Default Judgment, at 12 ("Defendant Robert Lawshe was mentally incapacitated after the negotiations broke down – he had a nervous breakdown which he did not begin to recuperate from until July 2003. . . . Mr. Lawshe was unable to assist in this action.").

Defendants counter that "[w]hile it has been asserted, without any support, that one of the Plaintiffs was mentally incompetent for a short period of time in 2002, which is disputed and unproved, even if for the sake of argument it is assumed that such somehow extends the statute of limitations, it would be to that Plaintiff only.  Morever, even that Plaintiffs' claims would still have been untimely filed on July 23, 2003 as outside of the one-year statute."  (Def. Br. at 16-17.)

The Court will not toll the statute of limitations as a result of Plaintiff's alleged mental incompetency.  As the Third Circuit has noted, mental incompetence "is not per se a reason to toll the statute of limitations in federal actions."  Lake v. Arnold, 232 F.3d 360, 371 (3d

-11-

**NOT FOR PUBLICATION**

Cir. 2000). Plaintiffs must establish that their putative mental disability constitutes an

"extraordinary circumstance" that prevents them from filing suit. See Nicolas v. Ocean Plaza

Condo. Ass'n, 73 Fed. Appx. 537, 540 (3d Cir. 2006) ("Under federal tolling principles, which

apply to federal statutes of limitations, a statute may be tolled when the plaintiff 'in some

extraordinary way has been prevented from asserting his or her rights.'") (quoting Lake, 232 F.3d

at 371); Bond v. United States, 43 Fed. Cl. 346, 349 (Fed. Cl. 1999) ("To maintain a claim of

legal disability to toll the statute of limitations, the plaintiff must bear a heavy burden as the law

presumes sanity and competency rather than insanity and incompetency.") (internal quotation

marks omitted). Plaintiffs have not presented any evidence to the Court which supports their

allegation that Mr. Lawshe was mentally incompetent during the relevant time period. And so

they have not presented any evidence to demonstrate that they could not sue Defendants during

the appropriate time period. The Court will not toll the statute of limitations due to Lawshe's

alleged mental incapacity.

    Also the Court notes that other circuit courts have held that ordinary tolling

principles do not apply to PMPA. In Hill v. Texaco, Inc., 825 F.2d 333, 335 (11th Cir. 1987), the

Eleventh Circuit found that:

> Congress indicated its contrary intent by specifying that "no action shall be
> maintained unless commenced within one year of . . . the date of" the violation, i.e.,
> the bad faith offer, or the date that the franchise ended. These are plain words. We
> think Congress said what it meant. . . . The parties have not cited nor have we been
> able to find cases where the Supreme Court or this circuit has applied equitable
> tolling to statutes expressly establishing an exact starting point, such as the date of
> violation or the date that the franchise ended, for a limitations period. Precise
> language combined with the extremely short limitations period convinces us that
> Congress did not intend for this limitation to be enlarged by the Courts. If Congress

NOT FOR PUBLICATION

> explicitly puts a limit upon the time for enforcing a right which it enacted, there is
> an end to the matter.

Hill, 825 F.2d at 335.  This Court has not found disagreement by other courts with the Hill

holding (nor have Plaintiffs cited any).  This Court's decision to not toll the statute of limitations

accords with the Hill court's rationale that typical equitable tolling principles do not apply to

PMPA actions.  See also DuFresne's Auto Service, Inc. v. Shell Oil Co., 992 F.2d 920, 929 (9th

Cir. 1993) (stating that PMPA "does not admit of tolling" and dismissing the action on statute of

limitations grounds without reaching the issue of whether the defendants violated PMPA).

      Second, Plaintiffs now state that they are bringing claims under the civil

Racketeer and Corrupt Organizations Act (RICO).  (Pl. Opp'n at 18.)  Plaintiffs argue that,

because the RICO Act has a statute of limitations period that is longer than one year, their claims

are not barred by the statute of limitations.  (Id.)

      The Court rejects this argument because Plaintiffs did not plead any civil RICO

claims in their Complaint and a plaintiff "may not amend a complaint through arguments in his

brief in opposition to a motion for summary judgment."  Bell v. City of Philadelphia, 275 Fed

Appx. 157, 160 (3d Cir. 2008).  The proper procedure is for a plaintiff to amend his pleadings

pursuant to Rule 15 of the Federal Rules of Civil Procedure.  Id.  Because parties may not raise

claims or causes of action for the first time in briefs opposing summary judgment, the Court

rejects Plaintiffs' attempt to do so now.

      Third, Plaintiffs argue that, under PMPA, the "clock" on the statute's one year

statute of limitations "does not start until after the termination date plus 90 or 180 days, and

negotiations end.  Defendants had the plaintiffs' security deposits, chattels and the proceeds of

**NOT FOR PUBLICATION**

the sales of the plaintiffs' property.  Thus, these monies belonging, due and owing to the

plaintiffs constitute property on deposit with the defendants – thus ongoing negotiations and

attempts at resolution.  Negotiations continued until shortly before the Summons and Complaint

was filed. . . . As there were ongoing negotiations . . . there is no Statute of Limitations issue

under the PMPA."  (Pl. Opp'n at 17.)

   The Court finds that Plaintiff's argument contradicts PMPA itself, which plainly

requires that the statute of limitations end one year after "the date of termination of the franchise

or nonrenewal of the franchise relationship."  <u>Kehm Oil.</u>, 537 F.3d at 294 (quoting 15 U.S.C.

§ 2805(a)).  The Court notes that Plaintiffs have not referred to any legal authority to support

their argument that 90 or 180 days should be added to the termination date before the statute of

limitations clocks begins running.  Their argument contradicts the plain language of the statute

and relevant case law.  <u>See</u> <u>Kehm Oil Co.</u>, 537 F.3d at 294.

   In addition, Plaintiffs' argument is belied by the Complaint's language that the

statute of limitations "would have run if not for the mental incompetence that was established by

Mr. Lawshe's doctor that arose out of this situation.  Thus, since the final breach occurred, as per

Spartan Oil in March 2002, the additional months of incompetence permit this matter [to] be

brought."  (Compl. ¶ 45.)  As the United States Court of Appeals for the Federal Circuit has

reminded, "pleadings are judicial admissions and a party may invoke the language of an

opponent's pleading to render the facts contained therein indisputable."  <u>E.C. McAfee v. United</u>

<u>States</u>, 832 F.2d 152, 154n.2 (Fed. Cir. 1987) (citing 4 J. Wigmore, Evidence § 1064, at 67

**NOT FOR PUBLICATION**

(Chadburn rev. 1972)).  Plaintiffs cannot now claim that the statute of limitations be calculated from a later date.

Fourth, Plaintiffs argue that "there is no State of Limitations issue under the PMPA as the claim is still not ripe for the two (2) minors."  (Pl. Opp. at 17.)

This Court rejects this argument as well.  The PMPA is clear that the statute of limitations expires one year after the date of the termination of the franchise or non-renewal of the franchise agreement.  As discussed, the Eleventh Circuit has held that Congress has intentionally established a "precise starting point" and an "extremely short limitations period," and that courts are not authorized to judicially enlarge it.  Hill, 825 F.2d at 335.  Plaintiffs have not advanced any judicial decisions which permit a tolling exception for minors under the PMPA. And this Court will not enlarge the Congressionally-enacted statute of limitations period on behalf of two plaintiffs' minor status.  See also McCall v. United States, 310 F.3d 984, 988 (7th Cir. 2002) (indicating that, in the context of the Federal Tort Claims Act (FTCA), a plaintiff's minor status is a less compelling reason to toll the statute of limitations period than a plaintiff's mental incompetency).  The Court finds that the minors' PMPA claims are barred by the statute of limitations.

Moreover, the Court dismisses the claims brought by the two minor children because there is no evidence in the record to support an inference that the minor children suffered legally cognizable damages as a result of Defendants' alleged misconduct.  See Discussion of Plaintiffs' Claim for Emotion Distress (Fifth Through Eighth Claims), infra.

-15-

**NOT FOR PUBLICATION**

The Court need not consider whether Defendants' alleged misconduct was a substantive violation of the PMPA because Plaintiffs' PMPA claims are untimely.

**III.    Slander, Libel, and Defamation (Plaintiffs' Third Claim)**

**A.    Legal Standard**

Under New Jersey law, to establish a prima facie case of defamation, whether denominated libel or slander, a plaintiff must show, in addition to damages, that a defendant "(1) made a defamatory statement of fact (2) concerning the plaintiff (3) which was false, and (4) which was communicated to a person or persons other than the plaintiff." Feggans v. Billington, 291 N.J. Super. 382, 390-91 (App. Div. 1996). See also Russo v. Nagel, 358 N.J. Super. 254, 262-63 (App. Div. 2003). In cases where a "plaintiff is a private figure and the speech is about an exclusively private concern, a traditional negligence standard of fault is applicable, which is defined as communicating the false statement while acting negligently in failing to ascertain the truth or falsity of the statement before communicating it." Feggans, 291 N.J. Super. at 391 (citing Turf Lawnmower Repair, Inc. v. Bergen Record Corp., 139 N.J. 392, 402-13 (1995)).

**B.    Analysis**

In their Complaint, Plaintiffs allege that "as a result of the allegations that make up the criminal complaint filed against the plaintiff by defendant Spartan in bad faith, Lawshe has suffered slander, liable [sic], and defamation." (Compl. ¶ 38.) Defendants argue that Plaintiffs have no evidence to support any of their claims. (Pl. Br. at 17)

**NOT FOR PUBLICATION**

The Court finds that Plaintiffs have not presented any evidence to support their defamation claim.  Nor do Plaintiffs discuss their defamation claim in their summary judgment briefings.  Absent a showing of evidence to support this claim, the Court dismisses it with prejudice.

**IV.     Plaintiffs' Claims for Emotional Distress (Fifth Through Eighth Claims)**

    **A.     Legal Standard**

To prevail on a claim for intentional infliction of emotion distress, New Jersey law requires a plaintiff to establish "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe."  Buckley v. Trenton Sav. Fund Soc'y, 111 N.J. 355, 366 (1988).  "Initially, the plaintiff must prove that the defendant acted intentionally or recklessly. . . . Second, the defendant's conduct must be extreme and outrageous.  The conduct must be 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'  Third, the defendant's actions must have been the proximate cause of the plaintiff's emotional distress.  Fourth, the emotional distress suffered by plaintiff must be so severe that no reasonable man could be expected to endure it."  Buckley, N.J. 355 at 366 (citations and internal quotation marks omitted).

    **B.     Analysis**

Defendants argue that Plaintiffs' claims for emotional distress must be dismissed because "Plaintiffs have failed to provide any documents, expert reports, medical records, contact information for treatment providers or other information to demonstrate a mental breakdown."

NOT FOR PUBLICATION

(Def. Br. at 20.) They claim that "[a]lthough Plaintiffs indicated that detail regarding the emotional harm and treatment . . . would be provided in the interrogatories; such treatment was never provided." (Def. Br. at 21.)

   The Court agrees with Defendants that Plaintiffs have not presented any evidence to support the Complaint's allegations that they suffered emotional harm. It follows that Plaintiffs have failed to establish a genuine issue of material fact as to whether they suffered sufficient emotional harm upon which an action for intentional infliction of emotion harm could be predicated. The Court dismisses with prejudice the Fifth through Eighth Claims for Relief in Plaintiff's Complaint.

## V. Plaintiffs' Civil Rico Claims

   As discussed, a plaintiff "may not amend a complaint through arguments in his brief in opposition to a motion for summary judgment." <u>Bell v. City of Philadelphia</u>, 275 Fed Appx. 157, 160 (3d Cir. 2008). Plaintiffs did not plead any civil Rico claims in their Complaint, and they are not permitted to first introduce a cause of action for a violation of the civil Rico statute at the summary judgment stage without having sought to amend their Complaint. The Court will not now entertain Plaintiff's substantive arguments for this cause of action.

## VI. Plaintiffs' Spoliation Claims

### A. Legal Standard

   Spoliation refers to the "hiding or destroying of litigation evidence, generally by an adverse party." <u>Rosenblit v. Zimmerman</u>, 166 N.J. 391, 400-01 (2001). When a court finds that a litigant has destroyed evidence during an underlying litigation, the courts may use the so-

NOT FOR PUBLICATION

called "spoliation inference" that "allows a jury in the underlying case to presume that the evidence the spoliator destroyed or otherwise concealed would have been unfavorable to him or her." Rosenblit, 166 N.J. at 402.  Additionally, a court may levy discovery sanctions against the spoliator.  Id.

New Jersey does not recognize spoliation as an independent tort, but does identify spoliation of evidence as wrongful conduct and provide a tort remedy for that wrong.  Rosenblit, 166 N.J. at 406.  The provided tort remedy "is not novel, but merely an invocation of the previously recognized tort of fraudulent concealment, adapted to address concealment or destruction during or in anticipation of litigation." Rosenblit, 166 N.J. at 406.  To establish fraudulent concealment, a plaintiff must show that "(1) defendant in the fraudulent concealment action had a legal obligation to disclose evidence in connection with an existing or pending litigation; (2) that the evidence was material to the litigation; (3) that plaintiff could not reasonably have obtained access to the evidence from another source; (4) that defendant intentionally withheld, altered or destroyed the evidence with purpose to disrupt the litigation; (5) that plaintiff was damaged in the underlying action by having to rely on an evidentiary record that did not contain the evidence defendant concealed." Ronsenblit, 166 N.J. at 406-07.

**B.    Analysis**

Plaintiffs argue that "no accounting or other records were provided by defendants in an attempt to justify their conduct.  Indeed, no documents were, upon information and belief, supplied to Maynard & Truland, plaintiffs prior attorneys.  When plaintiffs asked for access to the stations to obtain their records, such access was denied.  These documents were necessary to

**NOT FOR PUBLICATION**

ascertain the basis of the allegations.  As noted above, end of day records were completed by employees – since Spartan only alleged that it 'caught the error' once it caught up with its paperwork, some records had to have been provided to substantiate same."  (Pl. Br. at 23.)

The Court finds that Plaintiffs' allegations of spoliation cannot proceed because they have alleged spoliation without any reference to evidence in the record or discovery materials.  Plaintiffs have not revealed any discovery requests put to Defendants and unanswered.  They have not produced any evidence to support allegations that materials were destroyed or not produced.  Plaintiffs have failed to show (i) that Defendants had a legal obligation to disclose any evidence that was not produced, (ii) why Plaintiffs could not have obtained the requested evidence from another source, and (iii) that Defendants intentionally withheld, altered or destroyed any evidence to disrupt this litigation.  Because the Plaintiffs have failed to support their spoliation claims, the Court will not sanction Defendants for spoliation or invoke a spoliation inference.

## VI.   Payment of Attorney Fees

### A.   Background

On September 13, 2007, this Court ordered Defendants to "pay reasonable attorney's fees and costs of the Plaintiffs in regard to their Motion of Default filed on February 14, 2007 and reasonable attorney's fees and costs arising out of their appearance in Court on September 13, 2007."  Defendants have submitted to this Court their challenge to the fee request submitted by Plaintiffs.  Defendants raise issues with particular fee entries and contend that attorney fees should not be awarded because the action was untimely filed.  (Dkt No. 33.)

**NOT FOR PUBLICATION**

Defendants also argue that any fees awarded should be offset by any damages awarded to them on their counterclaim.

Plaintiffs ask for $15,738.92 in fees and $293.12 in expenses. (Dkt. No. 75.) The Court does not find this to be a reasonable amount of fees to award. The Court orders Defendants to pay $5,000 in attorneys' fees. However, because of numerous violations of the Local Rules committed by Plaintiffs' counsel in this action, the Court directs that this amount of attorneys' fees be paid to Plaintiffs themselves and not to Plaintiffs' counsel. The Court rejects Defendants' request that this award of attorneys fees be subject to a setoff against a sum that Defendants may be potentially awarded on their counterclaim. The Court will not predict at this stage of the litigation whether Defendants will prevail on their counterclaim. The Court requires that Defendants pay this $5,000 payment of attorneys' fees within twenty days of the date of this Opinion and accompanying Order.

## <u>CONCLUSION</u>

The Court grants Defendants' motion for summary judgment and dismisses with prejudice the claims in Plaintiffs' Complaint. The Court denies Plaintiffs' motion for summary judgment. The Court denies Defendants' motion to enforce the settlement agreement. The Court directs Defendants to pay $5,000 in attorneys' fees pursuant to the Court's September 13, 2007 Order, and directs that this amount be paid directly to Plaintiffs within twenty days of the date of this Opinion and accompanying Order.

January 19, 2010                                    s/William H. Walls
                                                     United States Senior District Judge

-21-